1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ----------------------------------------X
    ERIC SPRONZ,
4
                          Plaintiff,
5              -against-
           DOCKET NO.: 2:23-CV-03689 (JMA)(SIL)
6
    COUNTY OF SUFFOLK, SUFFOLK COUNTY EXECUTIVE
7   STEVEN BELLONE, IN HIS OFFICIAL CAPACITY
    ONLY, SUFFOLK COUNTY POLICE COMMISSIONER
8   RODNEY K. HARRISON, IN HIS OFFICIAL
    CAPACITY ONLY, SUFFOLK COUNTY COMMANDING
9   OFFICER OF THE PISTOL LICENSING BUREAU
    LIEUTENANT MICHAEL KOMOROWSKI, IN HIS
10  OFFICIAL CAPACITY ONLY, SUFFOLK COUNTY
    POLICE OFFICER KEVIN WUSTENHOFF, IN HIS
11  INDIVIDUAL AND OFFICIAL CAPACITY, SUFFOLK
    COUNTY POLICE OFFICER/PISTOL LICENSING
12  BUREAU POLICE OFFICER DANIEL JUGAN, IN HIS
    INDIVIDUAL AND OFFICIAL CAPACITY, JANE AND
13  JOHN DOE NO. 1-10, IN THEIR OFFICIAL AND
    INDIVIDUAL CAPACITY
14
                          Defendants.
15  ----------------------------------------X
                  Zoom Videoconference
16                New York, New York

17                DATE: September 26, 2024
                  TIME: 10:02 A.M.
18

19  DEPOSITION of KEVIN WUSTENHOFF, a Defendant

20  herein, taken by the Plaintiff, pursuant to

21  Article 31 of the Civil Practice Law &

22  Rules of Testimony, and held remotely,

23  before GABRIELLA TUTINO, a Stenographic

24  Reporter and Notary Public of the State of

25  New York.

1

2      A P P E A R A N C E S

3

4      LAW OFFICE OF RICHARD W. YOUNG, SR. ESQ
       Attorney for Plaintiffs
5      863 Islip Avenue
       Central Islip, NY 11722
6      631.224.7500
       BY: RICHARD YOUNG, ESQ.
7      BY: CORY MORRIS, ESQ.
       E-MAIL: Info@CoryHMorris.com
8

9      SUFFOLK COUNTY ATTORNEY'S OFFICE
       ASSISTANT COUNTY ATTORNEY
10     Attorney for Defendants
       H. Lee Dennison Building
11     100 Veterans Memorial Highway
       P.O. Box 6100
12     Hauppauge, NY 11788
       631-853-4055
13     BY: ARLENE S. ZWILLING, ESQ.
       E-MAIL: ARLENE.ZWILLING@SUFFOLKCOUNTYNY.GOV
14

15     ALSO PRESENT:

16     Eric Spronz, plaintiff

17     Lieutenant Michael Komorowski, defendant

18

19

20

21

22

23

24

25

1

2          S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED

5     by and between the attorneys for the

6     respective parties herein, that filing,

7     sealing and certification be and the same

8     are hereby waived.

9          IT IS FURTHER STIPULATED AND AGREED

10    that all objections, except as to the form

11    of the question shall be reserved to the

12    time of the trial.

13         IT IS FURTHER STIPULATED AND AGREED

14    that the within deposition may be signed

15    and sworn to before any officer authorized

16    to administer an oath, with the same force

17    and effect as if signed and sworn to before

18    The Court.

19

20    IT IS FURTHER STIPULATED AND AGREED that

21    subject to any rulings on any express or

22    reserved objections to particular

23    questions, the transcript of this remote

24    deposition will be deemed admissible for

25    purposes of any dispositive motions, and

1

2    will be deemed admissible by the

3    party-opponent at trial.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 K. WUSTENHOFF

2                 THE REPORTER: Will Counsel

3         stipulate it's okay to swear in the

4         witness remotely for today's

5         proceedings and that there is no

6         objection at this time, nor will

7         there be one at a future date.

8                 MR. YOUNG: I'm having problems

9         understanding what you're saying.

10                THE REPORTER: I'm going to

11        swear the witnesses in remotely, so

12        I'm asking Counsel to stipulate it's

13        okay to swear in the witnesses

14        remotely.

15                MR. YOUNG: Yes.

16                MS. ZWILLING: So stipulated.

17

18   K E V I N   W U S T E N H O F F, after

19   having first been duly sworn by a Notary

20   Public of the State of New York, was

21   examined and testified as follows:

22

23   EXAMINATION BY MR. YOUNG:

24        Q.    State and spell your name for

25   the record, please.

```
 1                    K. WUSTENHOFF
 2        A.    Kevin Wustenhoff.
 3        Q.    State and spell your address
 4   for the record, please.
 5              MS. ZWILLING: Business address
 6          please.
 7        A.    30 Yaphank Avenue, Yaphank, New
 8   York 11980.
 9        Q.    Mr. Wustenhoff, what's your
10   birthday?
11              MS. ZWILLING: Objection.  Just
12          give the year of your birth.
13        A.    1977.
14        Q.    Tell us about your educational
15   background?
16        A.    12 years of high school, 12
17   years of public school education, graduated
18   from high school.  Little over a year of
19   college education and police academy
20   training.
21        Q.    Okay.  Where did you go to
22   college?
23        A.    SUNY Canton in Canton, New
24   York.
25        Q.    Now, what date did you join the
```

                    K. WUSTENHOFF

Suffolk County Police Department?

        A.      September 12, 2005.

        Q.      Was that the first law
enforcement agency you ever belonged to?
Were there any prior law enforcement
experience?

        A.      Not as a police officer.

        Q.      What prior experience did you
have?

        A.      Before that I worked for the
district attorney's office and I don't know
if it counts or not, but I worked for the
Department of Public Safety for a number of
years.

        Q.      So could you tell us about that
employment history?

        A.      Which one.

        Q.      Well, start with your first job
you had?

        A.      My first I ever had or, can you
be a little more specific.

        Q.      Let's say from high school on?

        A.      My first job that I ever had
was working for a packaging company.

                        K. WUSTENHOFF

     1

     2          Q.    Okay?

     3          A.    After that I worked for King

     4     Cullen.

     5          Q.    All right?

     6          A.    I was a pizza delivery guy.

     7          Q.    Okay.  At what point did you

     8     start working with either, which did you

     9     start working with first, public safety or

    10     the district attorney's office?

    11          A.    Public safety.

    12          Q.    Okay.  Who employed you and

    13     what did you do?

    14          A.    It was the Town of Brookhaven

    15     and served to be eyes and ears for parks

    16     grounds and serve noise summons for people

    17     who violate the ordinances.  Collect road

    18     hazards, abandoned vehicles.

    19          Q.    When did you start that

    20     employment?

    21          A.    1996.

    22          Q.    Okay.  How long were you

    23     employed by them?

    24          A.    Let's see.  It was probably on

    25     again, off again for approximately nine

1                    K. WUSTENHOFF

2    years.

3         Q.    Did you have to go to any kind

4    of training to be able to issue summons or

5    stuff like that, law enforcement training?

6         A.    It was all inside employment

7    training by people who had forms of

8    experience before that.

9         Q.    Okay.  You did issued summons

10   while you were part of that organization?

11        A.    Yes.

12        Q.    Okay.  And, at what time, what

13   was your next job after that one?

14        A.    I think I might have worked

15   for, we are going back some time, there was

16   a local newspaper.

17        Q.    Okay.  So you were

18   approximately 21 when you started with

19   Brookhaven?

20        A.    I was 19.

21        Q.    19, and then you worked for

22   them about nine years. So you were about 28

23   when you finished with them?

24        A.    Well I finished that, I had

25   left some times and went back.  So it was

                    K. WUSTENHOFF
1

2    on again, off again, yes, roughly 28 when I

3    returned a couple of years later one more

4    time.

5         Q.    Okay.  So after you left this

6    Brookhaven, you went to work for non law

7    enforcement type positions?

8         A.    Yes.

9         Q.    And then you returned to them

10   at some point?

11        A.    Yes.

12        Q.    Okay.  How long did you return

13   to them for?

14        A.    I returned back to them in 2008

15   and I worked for two more years there.

16        Q.    You were actually a police

17   officer at that time then; correct?

18        A.    Correct.

19        Q.    When did you work for the

20   district attorney's office?

21        A.    It was 2002 until my hire date

22   at the police department.

23        Q.    What did you do at the district

24   attorney's office?

25        A.    I served as an aide dealing

1                    K. WUSTENHOFF

2    with archived files.

3          Q.    Okay.  Is that the full extent

4    of your government employment; the Town of

5    Brookhaven, the district attorney's office,

6    and the Suffolk County Police Department?

7          A.    No, I worked one summer with

8    South Hampton Town Police Department as a

9    traffic control officer.

10         Q.    What year was that?

11         A.    I think it was 2000 or 2001.

12         Q.    Did you get any training for

13   that position?

14         A.    It was inside the employment,

15   they taught us how to write parking

16   tickets.

17         Q.    Now, you joined the Suffolk

18   County Police Department September 12,

19   2005.  Tell us about your training with

20   them?

21         A.    It was classroom training for

22   criminal procedure law, penal law, vehicle

23   and traffic law, hands-on for defensive

24   tactics, driving instruction, firearms

25   training, EMT.

                    K. WUSTENHOFF

1

2      Q.     How long did this training

3   last?

4      A.     It went through March of 2006.

5      Q.     Then you graduated the police

6   academy in March?

7      A.     Correct.

8      Q.     Where were you assigned?

9      A.     The 7th precinct.

10      Q.     Post academy, did you have any

11   training?

12      A.     Yes.

13      Q.     Okay.  Would that be inservice

14   training?

15      A.     Yes.

16      Q.     Did you ever have any other

17   training other than inservice training

18   after you left the academy?

19      A.     No.

20      Q.     Now, how long were you in the

21   7th precinct?

22      A.     Until 2010.

23      Q.     Where were you transferred to

24   then?

25      A.     I went to, initially it was to

```
 1                    K. WUSTENHOFF
 2    chief of department holiday task force.
 3         Q.    All right.  How long did that
 4    last?
 5         A.    Six or eights weeks, no more
 6    than two months.
 7         Q.    Then where did you go?
 8         A.    Selective alcohol fatality
 9    enforcement team.
10         Q.    Is that a part of highway?
11         A.    Yes, it is.
12         Q.    Did you get any training for
13    that?
14         A.    Yes.
15         Q.    Where was that training done?
16         A.    Police academy.
17         Q.    You returned to the academy for
18    that training?
19         A.    Yes.
20         Q.    How long was that for?
21         A.    Depends upon the training.
22         Q.    Well how long was it for you?
23         A.    It depends on the training.
24         Q.    How many times did you return
25    to the police academy for training in that
```

1                    K. WUSTENHOFF

2     unit?

3          A.    I would have to refer to my

4     personal records to know that.

5          Q.    Was it more than two?

6          A.    Yes.

7          Q.    Was it less than 10?

8          A.    I couldn't say.

9          Q.    Okay.  What was the training

10    you were receiving regarding that?

11         A.    Utilizing intoxilyzer, how to

12    direct field sobriety tests, the ARIDE

13    training which was like the preliminary,

14    trying to make observations for drug

15    impairment.  But that was continual.

16         Q.    Did you receive any highway

17    accident investigation training?

18         A.    No.

19         Q.    Did you ever receive any

20    detective or investigative training?

21         A.    No.

22         Q.    Approximately how many times

23    have you testified in court?

24         A.    Speculating at best, you know,

25    I don't know that I can put a hard number

                    K. WUSTENHOFF

1   on that.  It could be 50 times.

2        Q.    Okay.  Would that include

3   refusal hearings?

4        A.    Yes.

5        Q.    So, in a court of law before a

6   judge, how many times, in a court of law,

7   district court, county court, you know, how

8   many times have you testified; if you can

9   recall?

10       A.    It would be very difficult for

11  me to put a hard number on that.  It really

12  would be.

13       Q.    When was the last time you

14  testified in a court of law?

15       A.    In 2020.

16       Q.    There came a point in time you

17  were assigned to the pistol license

18  division or section, whatever?

19       A.    Yes.

20       Q.    When was that?

21       A.    November 1, 2022.

22       Q.    And, what was your position in

23  this pistol license?

24       A.    Police officer.

                    K. WUSTENHOFF

1

2      Q.    Okay.  What was your function?

3      A.    Investigate pistol license

4  applicants.

5      Q.    Okay.  Did you receive any

6  training in how to investigate pistol

7  license applicants?

8      A.    Yes.

9      Q.    Who gave you the training?

10     A.    Members of the bureau.

11     Q.    So it was on-the-job training?

12     A.    Yes.

13     Q.    So it wasn't inservice where

14  you went somewhere else and sat down and

15  they taught you?

16     A.    Yes.

17     Q.    Yes, what? Yes it was, or no it

18  wasn't?

19     A.    The way you asked it the answer

20  was yes.

21     Q.    So you went to another location

22  and you were trained on how to investigate?

23     A.    No, the way you asked it is if

24  I had it assigned in the office which I

25  did.

                    K. WUSTENHOFF

1

2      Q.    So basically you were given

3   cases and you asked people what you should

4   be doing?

5      A.    Yes.

6      Q.    So, was your only function to

7   investigate applicants?

8      A.    No.

9      Q.    What was your other functions?

10      A.    Assist with the counter for

11   walk-in inquiries and services for people

12   who were coming in.

13      Q.    Any other function besides

14   that?

15      A.    As I became more proficient in

16   the position dealing with pistol license

17   suspensions, transfers, and retirements of

18   police officers, daily inquiries coming

19   over the phone, people walking in, things

20   of that.

21      Q.    Okay.  So what point did you

22   start investing pistol license suspensions?

23      A.    In 2023.

24      Q.    Do you know what month you

25   started investigating pistol license

                    K. WUSTENHOFF

1    suspensions?

2         A.    Yes.

3         Q.    What month?

4         A.    February.

5         Q.    Was Spronz the first matter you
6    were assigned to for pistol license
7    suspension?

8         A.    Yes.

9         Q.    Okay.  So, who gave you this
10   assignment?

11        A.    The admin staff assigns me. I
12   walk in and I get it from the admin staff.

13        Q.    Who is the admin staff; is it
14   sergeant, lieutenant?

15        A.    I get the envelope from, I
16   don't know who the title is, it's one of
17   the secretaries.

18        Q.    Is there cross talk going on
19   here? Please, no crosstalk?

20        A.    I was speaking my thought
21   aloud.  I don't know what her title is and
22   I don't want to belittle her by calling her
23   a secretary. I want to say she is a
24   principal assistant or something like that.

1                    K. WUSTENHOFF

2         Q.    Okay.  So she gives you an

3    envelop that says you have this case;

4    right?

5         A.    Correct.

6         Q.    What was in the envelope?

7         A.    A suspension notice.

8         Q.    That was it?

9         A.    And a case file of the

10   suspended licenses.

11        Q.    When you say case file, what is

12   that?

13        A.    It is the file that pertains to

14   the pistol licensing.

15        Q.    So that means, are we

16   discussing the licensee, their application,

17   and any other prior involvement they had

18   with the pistol license section; is that

19   what we're discussing?

20             MS. ZWILLING: Objection.

21        What, you're asking the witness what

22        the two of you are discussing? I'm

23        not sure that makes any sense.

24        Perhaps you can rephrase your

25        question so it's clearer.

1                    K. WUSTENHOFF

2          Q.    You said that there was a

3     suspension notice and a pistol licensee

4     information; right?

5          A.    Yes.

6          Q.    What's in that envelope, what

7     does that consist of?

8          A.    It is a cover letter with the

9     suspension letter that they get in the

10    mail, that's mailed to them, and then

11    inside is the pistol licensee's file.

12         Q.    Maintained by the Suffolk

13    County Police Department pistol license

14    section?

15         A.    Yes.

16         Q.    Okay.  Was there anything else

17    in there?

18         A.    Aside from the file.

19         Q.    Aside from his pistol license

20    file and his suspension notice, was there

21    anything else in this envelope?

22         A.    No.

23         Q.    So since this is your first

24    case, what did you think you were supposed

25    to do with it?

```
 1                    K. WUSTENHOFF

 2         A.    Investigate the cause of the

 3    suspension.

 4         Q.    Okay.  Did you talk to anybody

 5    about what you should be doing to

 6    investigate this?

 7         A.    Yes.

 8         Q.    Who did you talk to?

 9         A.    At that time it would have been

10    other coworkers in the office.

11         Q.    Okay.  And after speaking with

12    them, what did you undertake?  What did you

13    do?

14         A.    Read the file.

15         Q.    Okay?

16         A.    Read the matter that took place

17    that caused the suspension.

18         Q.    Okay.  That would be the field

19    report?

20         A.    Yes.

21         Q.    Anything else that you read

22    besides the field report?

23         A.    His file, which would --

24         Q.    His license file maintained by

25    the Suffolk County Police Department;
```

```
 1                 K. WUSTENHOFF
 2   right?
 3        A.    Yes.
 4        Q.    I'm talking about now from the
 5   incident.  What you did you read besides
 6   the field report?
 7        A.    How many guns he had.
 8        Q.    That would be on his pistol
 9   license section information; correct?
10        A.    Correct.
11        Q.    So we've established that you
12   read that.  Other than the field report
13   regarding this incident, what did you read?
14        A.    At that particular time that
15   would probably be it.
16        Q.    Okay.  What was the first thing
17   you undertook with regard to this
18   investigation?
19        A.    Making contact with the
20   licensee.
21        Q.    How did you do that?
22        A.    Telephone.
23        Q.    And, where did you call him
24   from?
25        A.    From pistol licensing bureau.
```

1                      K. WUSTENHOFF

2        Q.    Do you use the pistol licensing

3   bureau telephones to make that phone call?

4        A.    Yes.

5        Q.    Okay.  What date did you call

6   him?

7        A.    I think the first date that I

8   spoke with him was the date I was assigned.

9        Q.    Okay.  Did you make any notes

10  regarding that telephone call?

11       A.    Yes.

12       Q.    Where are these notes?

13       A.    They would be in his file.

14       Q.    Okay.

15            MR. YOUNG: I call for

16            production of notes from the file as

17            we do not have any notes.

18            MS. ZWILLING: Incorrect.  You

19            were provided with the complete file.

20       Q.    When you say you wrote notes,

21  how did you write them?  How did you

22  memorialize them?

23       A.    I entered them in a computer

24  which is the digital file for the licensee.

25       Q.    What was the next thing you did

                    K. WUSTENHOFF

 1
 2   after you contacted him by phone with
 3   regards to this investigation?
 4        A.    Documented the call.
 5        Q.    After that what did you do?
 6        A.    I think that was it for the
 7   first day.
 8        Q.    Let's get off the first day.
 9   What was the next thing you undertook with
10   regard to this investigation?
11        A.    I would have to see the file to
12   know what date I spoke with him next.
13   Couldn't have been too long after.
14        Q.    You have your file with you?
15        A.    No.
16        Q.    Have you reviewed your file
17   before this deposition?
18        A.    Somewhat, yes.
19        Q.    Okay.  So, so tell me, you're
20   investigating his pistol license
21   suspension.  You call him. How many times
22   did you call him?
23        A.    That first time I think it was
24   just once.  Could have been twice but it
25   may have been once or twice.

1                     K. WUSTENHOFF

2          Q.    After you speak with him, what

3     did you do?

4          A.    I documented that I spoke with

5     him.

6          Q.    I understand that.  We are

7     beyond speaking with him.  What else did

8     you do?

9          A.    Again, I'd have to look at the

10    date but I spoke with one of the police

11    officers that went to his house.

12         Q.    Okay.  What was the sum and

13    substance of that conversation?

14         A.    I wanted to ask about the

15    incident that was documented by them.

16         Q.    Okay.  What did they say?

17         A.    I was told that there was an

18    incident where a complainant stated that,

19    we haven't used his name so I don't know if

20    I'm supposed to say it first or not.

21         Q.    You can say it?

22         A.    I was told that Eric Spronz

23    went to a private home and that the

24    complainant stated that he visibly had a

25    gun on his person while he was assisting

                        K. WUSTENHOFF
one of the complainant's family members in
a domestic dispute with a husband moving
belongings from the house.

        Q.    She was having a domestic
dispute at that time?

        A.    I don't know, I wasn't there.

        Q.    Okay.  Did you ask the officer
if there was a domestic dispute at that
time?

        A.    No.

        Q.    So Mr. Spronz was there just to
help this person move furniture out; to
your knowledge?

        A.    Yes.

        Q.    You didn't know if there was an
ongoing, if there was an actual dispute
ongoing at that very time; did you?

        A.    On that date, no.

        Q.    Now, what else did the officer
tell you?

        A.    That the, looked in the
computer to see what kind of pistol license
Mr. Spronz had.  And verified the validity
of his license status.

                         K. WUSTENHOFF

1

2        Q.    Right?

3        A.    And then they wrote a police

4    report.

5        Q.    And you reviewed that report;

6    correct?

7        A.    Yes.

8        Q.    That report said that

9    Mr. Spronz's pistol was not visible when

10   the police arrived; correct?

11       A.    I don't know that it says that.

12   I'd have to look at it.

13       Q.    It's the field report; correct?

14            MS. ZWILLING: Why don't you

15        show him the document.  That would

16        facilitate the response.

17            MR. YOUNG: What am I going to

18        do, hold it up to the camera.

19            MS. ZWILLING: No, have the,

20        screen share it or have the reporter

21        mark it and screen share it.

22            MR. YOUNG: Unfortunately

23        Arlene, I don't know how to do any of

24        that with a computer.

25            MS. ZWILLING: I'm sure

1                    K. WUSTENHOFF

2          Mr. Morris is capable of it.

3                    MR. MORRIS: I'm glad I have

4          the opportunity to chime in.  Officer

5          is there anyone in the room with you?

6                    MS. ZWILLING: Cory, you're not

7          conducting the deposition.

8                    MR. MORRIS: I'm not, okay. Mr.

9          Young, are you able to conduct the

10         deposition.  I know you've been doing

11         this for quite some time. You don't

12         have any problems conducting the

13         deposition in the manner you see fit,

14         do you.

15                   MR. YOUNG: No, I don't.

16                   MS. ZWILLING: Cory, one of you

17         can conduct the deposition going

18         forward.  Okay, don't yell at me

19         again and don't smirk at me.  You're

20         not funny.

21                   MR. YOUNG: No --

22                   MS. ZWILLING: Matter of fact,

23         you're misogynistic and offensive and

24         insulting.

25                   MR. MORRIS: I'm sorry, are you

```
 1                K. WUSTENHOFF
 2       done.
 3            MS. ZWILLING: Please do not
 4       belittle me like that again.
 5            MR. MORRIS: I'm just objecting
 6       to everything you said. I was sitting
 7       here quietly.
 8            MS. ZWILLING: Which one --
 9            MS. MORRIES: Are you done
10       speaking, I'd like to talk now.
11            MS. ZWILLING: I am entitled,
12       as entitled to speak at this
13       deposition as you are.
14            MR. MORRIS: Let me know when
15       you're done.
16            MS. ZWILLING: And that entails
17       you not interrupting me.
18            MR. MORRIS: When you're done
19       please.
20            MS. ZWILLING: One of you may
21       go forward with the deposition.  It's
22       not going to be a tag team.
23            MR. MORRIS: Are you finished
24       speaking.
25            MS. ZWILLING: Again Mr.
```

```
 1                    K. WUSTENHOFF
 2        Morris, do not speak down to me.
 3              MR. MORRIS: I'm asking you if
 4        you're finished speaking.
 5              MS. ZWILLING: Yes, in a rather
 6        dismissive demeaning manner.  I treat
 7        you like a colleague.  I expect you
 8        to --
 9              MR. YOUNG: Can we move along
10        here, I have things to ask.
11              MS. ZWILLING: Why don't you go
12        forward with the questioning.
13              MR. YOUNG: I am.
14              MS. ZWILLING: Please allow me
15        to finish. If the witness cannot
16        remember the contents of a document,
17        he can tell you that.  If you wish to
18        have the reporter screen share
19        things, I'm sure she can accommodate
20        you but that's your choice.
21              MR. YOUNG: I'll go on with my
22        questioning.
23              MS. ZWILLING: Sorry.
24              MR. YOUNG: I'll go on with my
25        questioning now.  Thank you Arlene.
```

1                    K. WUSTENHOFF

2          Q.    Now Officer Wustenhoff, isn't

3      it a fact that the field report says when

4      the unassigned officer arrived, the weapon

5      was concealed and O was cooperative with

6      notifying responding officers of his

7      weapon.  Doesn't it actually say that?

8          A.    To my recollection, yes.

9          Q.    All right.  So after speaking

10     with the officer, what did you do next?

11         A.    I believe I went home.

12         Q.    I'm not talking about that day,

13     I'm talking your next investigative task

14     regarding this case that you been handed to

15     by the administrative staff.  What did you

16     do investigative, in pursuit of your

17     investigation?

18         A.    I don't want you to think I'm

19     cracking wise, I just want you to be

20     specific with the question. It's a very

21     broad investigation.

22         Q.    What was your next

23     investigative task regarding Spronz after

24     speaking with the officer?

25         A.    Ensuring that the firearms were

1                    K. WUSTENHOFF

2    properly secured.

3         Q.    Okay.  How did you do that?

4         A.    I contacted Mr. Spronz by a

5    telephone to make sure he surrendered the

6    firearms.

7         Q.    That was the first day he did

8    that.  I'm talking about now after you

9    spoke with the officer.  What day did you

10   speak with the officer?

11        A.    Within the first couple days of

12   the license suspension.

13        Q.    Okay.  So after speaking with

14   Spronz, you stated that the next thing you

15   did was speak to the officer who was at the

16   scene; is that correct?

17        A.    Yes.

18        Q.    Okay.  What did you do

19   investigative as part of your investigation

20   after speaking with the officer?

21        A.    I checked Mr. Spronz's criminal

22   history, and incidents relating to his name

23   and address.

24        Q.    Okay.  And when did you do

25   that?

                    K. WUSTENHOFF

1

2      A.    That would have been over the

3   course of February 27 through July, I

4   believe it was July 11 which was the length

5   of the investigation.

6      Q.    So you checked Mr. Spronz's

7   criminal background.  Did you find

8   anything?

9      A.    No.

10     Q.    Okay.  What else did you do

11  besides investigate Mr. Spronz?

12     A.    I received an unsolicited

13  statement from other people that state that

14  they could account what took place that

15  day.

16     Q.    When did you receive that?

17     A.    I think that was on March 6 or

18  March 7.

19     Q.    What did you do after receiving

20  that?

21     A.    I contacted Mr. Spronz.

22     Q.    Okay.  What was the sum and

23  substance of the conversation?

24     A.    I asked him why he interfered

25  with my investigation.

1                    K. WUSTENHOFF

2          Q.    How is that an interference?

3          A.    Because there's no way for me

4    to get an objective statement from someone

5    if it's been guided on a prior statement.

6          Q.    Okay.  And, isn't it a fact

7    that Mr. Spronz had to send in a letter to

8    the pistol license section explaining the

9    occurrence?  Wasn't that demanded from the

10   pistol license section?

11         A.    Yes, it was.

12         Q.    Okay.  And wasn't that letter

13   in response to that?

14         A.    His statement was the response

15   to that.

16         Q.    So he can't submit statements

17   of other witnesses?

18         A.    He can do whatever he likes I

19   suppose.

20         Q.    So, after you -- now all of

21   this stuff like contacting the officer who

22   was at the scene, that's documented in your

23   computer notes of this case?

24         A.    I would have to review the

25   notes of the case.  If it is it's going to

                    K. WUSTENHOFF
1
2    be inside the licensee, the data file from
3    the licensee.
4          Q.    All of these conversations
5    you're having with Mr. Spronz, they were
6    also part of your computerized notes?
7          A.    Yes.
8          Q.    Every one of them?
9          A.    Almost all of them.
10         Q.    After contacting Mr. Spronz and
11   telling him he interfered with your
12   investigation, what did you do next?
13         A.    Occasionally over that time
14   period from February to July, I would
15   review the case, see if there was any new
16   information that came up with Mr. Spronz.
17         Q.    I.e. what does that mean, that
18   he was arrested or something?
19         A.    Yes.
20         Q.    Okay.  What else did you do as
21   far as your investigation into his
22   suspension?
23         A.    I also investigated the
24   location where it took place.
25         Q.    Did you drive there?

```
 1                    K. WUSTENHOFF

 2        A.    No.

 3        Q.    So, how do you investigate it?

 4        A.    Using our computer system.

 5        Q.    What were you looking for?

 6        A.    If there was a history of

 7   criminality or domestic incidents or

 8   anything suspicious taking place, whatever

 9   the history that was recorded by police

10   that took place at that location.

11        Q.    What did you find?

12        A.    I found that there was a family

13   that lived there, and I learned the

14   information of the woman that Mr. Spronz

15   was there to help.

16        Q.    Okay.  What did you find out

17   about her?

18        A.    She lived there.  She was

19   married to another resident there, she was

20   by marriage related to the homeowner.  She

21   had a history of arrests, and that was it

22   for her.

23        Q.    Okay.  Did you investigate

24   anyone else from that address?

25        A.    The homeowner.
```

                    K. WUSTENHOFF

1

2        Q.     What did you investigate as far

3   as him?

4        A.     I reviewed if he had any recent

5   criminality, if there were any police

6   interactions at the house, and I did have a

7   telephone interview with him.

8        Q.     Okay.  When was that?

9        A.     I believe that was in March of

10  2023.

11       Q.     Is that in your computerized

12  notes that you spoke with him?

13       A.     Yes, I believe that's in there.

14       Q.     What was the sum and substance

15  of that conversation?

16       A.     I believe his name was Wayne

17  Algier.  Wayne Algier was the homeowner.

18  He stated that his, he had a family member

19  and a wife staying in his house on the

20  night that we are talking about which was I

21  believe February 18.

22       Q.     Yes?

23       A.     February 18, 2023, he states

24  that while working in his driveway with

25  another family member, you have to forgive

1          K. WUSTENHOFF

2    me because I can't remember who that was, I

3    just know he identified it as another

4    family member. Were working on the

5    alternator on his truck in the driveway

6    when a pickup truck approached the front of

7    the house on the street, and identified

8    Mr. Spronz as exiting the vehicle.  And he

9    said that from the driveway he could see

10   that Mr. Spronz was wearing a pistol on his

11   hip.  And they had a discussion, didn't

12   sound like it was very nice, where he says

13   that Mr. Spronz, he asked Mr. Spronz if

14   he's a cop, Mr. Spronz says yes.

15   Mr. Algier says what precinct, Mr. Spronz

16   corrects himself and says no, I'm not a

17   cop, and Mr. Algier tells him that he

18   doesn't want him to bring the gun up onto

19   his property.  He then reports that

20   Mr. Spronz returns to his truck which is

21   still parked on the street, but he notices

22   at least one child sitting in the truck.

23   When he returns back to the driveway he no

24   longer can visibly see the firearm on him.

25   And then Mr. Spronz, this is according to

                    K. WUSTENHOFF

1  Mr. Algier, is notified by him that he is

2  calling the police because he feels that

3  this is an incident requiring police

4  attention.

5      Q.   Okay.  Did you put all of these

6  statements of Mr. Algier on the computer or

7  just did you note that you made a phone

8  call to him?

9      A.    I believe I made a, I believe I

10 made a pretty specific documentation to

11 remarks that he said including his reason

12 for calling the police which was a repeated

13 phase of, he felt Mr. Spronz was emanating

14 a show of force to him.

15     Q.   Other than Mr. Algier, did you

16 speak with anybody else regarding this

17 incident?

18     A.   No.

19     Q.   Okay.  After speaking with

20 Mr. Algier sometime in March, what was the

21 next investigative step you took in this

22 matter?

23     A.    I took his account of the

24 information and reviewed it against the

K. WUSTENHOFF

1  statements of the other parties that

2  Mr. Spronz provided.

3       Q.    Did you contact any of those

4  other parties?

5       A.    No.

6       Q.    Did Mr. Spronz provide

7  photographs with his documentation of the

8  incident?

9       A.    Yes.

10      Q.    Did you see that Mr. Spronz had

11  a very oversized sweatshirt on?

12      A.    I saw that he took a picture in

13  what appeared to be a different location

14  from where the incident took place and he

15  is wearing an oversized sweatshirt.

16      Q.    Could it be the same sweatshirt

17  Mr. Algier identified as some kind of

18  shooting club sweatshirt?

19      A.    Yes.

20      Q.    The sweatshirt that has no

21  zipper in the front?

22      A.    I don't recall that.

23      Q.    It goes down to well below his

24  waist?

                        K. WUSTENHOFF

     A.    Yes.

     Q.    Did you ask Mr. Algier how he
could see this pistol on somebody wearing
such a sweatshirt?

     A.    Yes.

     Q.    What was his answer?

     A.    He said that the sweatshirt was
behind the gun and he could see the gun on
his hip.

     Q.    So the sweatshirt was tucked in
his pants, is that his answer?

     A.    I suppose you would have to ask
him that.  He just told me that he could
see the gun quite visibly.

     Q.    I understand but you're the one
investigating this?

     A.    I just provided you my answer.

     Q.    So you didn't delve further in
investigation how a sweatshirt that goes
down well below somebody's waist --

     A.    I don't need to be provided a
satisfactory answer in which he told me he
could see the firearm before he's even on
the property.

```
 1                    K. WUSTENHOFF
 2         Q.    This was February 18; correct?
 3    2023?
 4         A.    Yes.
 5         Q.    Where did this take place?
 6         A.    22 Virginia Road in Centereach.
 7         Q.    And approximately what time?
 8         A.    I believe it was at dusk.
 9         Q.    If I told you the field report
10    stated that they were there at 14:19, would
11    you dispute that?
12         A.    I wouldn't dispute that.
13         Q.    Okay.  Do you know what the
14    weather was in Centereach on February 18,
15    2023?
16         A.    No.
17         Q.    You didn't check the weather
18    for that date?
19         A.    No.
20         Q.    If I told you it was 37 degrees
21    with a 7 to 10 mile an hour sustained wind,
22    would you dispute that?
23         A.    I suppose if you're getting it
24    from reliable source, then no, I won't
25    dispute that.
```

K. WUSTENHOFF

1

2      Q.      The times that you speak to

3  Mr. Wayne Algeer, Algier, whatever his name

4  is?

5      A.      You came across muffled, can

6  you ask that again.

7      Q.      How many times did you speak

8  with this Wayne Algier, Algeer, whatever

9  his name was?

10      A.      I believe once.

11      Q.      Okay.  Then after speaking with

12  him, what if anything did you do as part of

13  your investigation in Mr. Spronz's pistol

14  suspension?

15      A.      I reviewed Mr. Algier's

16  statement to me against the statements that

17  were provided from outside witnesses by

18  Mr. Spronz.

19      Q.      Again, you never contacted any

20  of them?

21      A.      No.

22      Q.      After that, after reviewing and

23  comparing it what did you do as part of

24  your investigation?

25      A.      Probably not a lot for a while.

```
1                    K. WUSTENHOFF

2          Q.    Did you have any timeframe that

3     you had to resolve this investigation?

4          A.    Yes.

5          Q.    What was your timeframe?

6          A.    Six months.

7          Q.    Why six months?

8          A.    Because that is the standard of

9     practice.

10         Q.    Standard of practice of what?

11         A.    For pistol licensing bureau.

12         Q.    So you have six months to

13    investigate while he's suspended?

14         A.    Yes.

15         Q.    Okay.  And then what happens?

16         A.    In most cases I tell people

17    that my job is to do everything I can to

18    get them reinstated after the six months.

19         Q.    Why is it a six month

20    suspension?

21         A.    Because that is the standard of

22    practice for the bureau.

23         Q.    Everybody gets suspended for

24    six months regardless of the allegation

25    against them?
```

1                    K. WUSTENHOFF

2          A.     Generally speaking, it's

3     usually six months.

4          Q.     So, how many other cases have

5     you investigated regard pistol license

6     suspension?

7          A.     Now probably 20 or 30.

8          Q.     And they are all suspended for

9     six months?

10         A.     Yes, sometimes longer.

11         Q.     How does that determine that it

12    will be longer?

13         A.     I suppose that depends upon

14    each individual circumstance.

15         Q.     What does that mean?

16         A.     I suppose that would be each

17    individual circumstance.

18         Q.     Yeah, what changes the

19    circumstance?  What are the different

20    circumstances?

21         A.     There's a thousand different

22    circumstances. I'm not sure exactly how you

23    want me to answer that.

24         Q.     Okay.  So, it's determined by

25    Suffolk County pistol license that based on

1                    K. WUSTENHOFF

2    this allegation by Mr. Wayne Algier, Mr.

3    Spronz is going to be suspended for a

4    minimum of six months and after your

5    investigation he may get his pistol permit

6    back; is that what you're telling us?

7          A.    So long as there's no other

8    type of incident that would require a

9    longer suspensions, yes.  My goal would be

10   to have him reinstated.

11         Q.    And, who suspended Mr. Spronz?

12         A.    I receive it suspended.  But it

13   ultimately comes from my supervisor.

14         Q.    Who is that?

15         A.    Lieutenant Komorowski.

16         Q.    Now, you're not trying to

17   verify whether or not the allegation is

18   legitimate or not?

19         A.    I verified that.

20         Q.    So, you didn't contact any

21   other witnesses and you only spoke with a

22   gentleman who said that he saw a gun on a

23   person with an oversized hoodie with no

24   zipper. That was verified?

25         A.    It was verified by the

                    K. WUSTENHOFF

1    information provided by Mr. Algier and then

2    there were two witness statements and the

3    licensee statement that if you read them it

4    spells out why he was suspended.

5        Q.    So, you tell me, what spelled

6    it out?

7        A.    Sure.  He entered a known

8    domestic situation, he came to a property

9    with a homeowner was out front before he

10   got on it, who told him do not a bring a

11   gun there. He allowed himself to get

12   involved in a domestic incident because the

13   one witness even articulates in their

14   statement that it was a contentious divorce

15   that Marie Algier was going through with

16   her husband.  So not being able to verify

17   whether or not her husband would be there

18   or not enters the possibly that he could be

19   going into a violent domestic situation

20   while carrying a firearm.  There was at

21   that time no sign that was posted that

22   welcomed him there but the homeowner was

23   very clear by saying he cannot come onto

24   his property with the firearm.  The way

1                    K. WUSTENHOFF

2    that Mr. Algier describes it to me is it

3    that Mr. Spronz returns to his truck for

4    just a second and puts his firearm in the

5    truck.  Now I don't know what he puts it

6    into, but Mr. Algier says there's a child

7    in the truck.  And then when he returns,

8    that he returns without a firearm.  So

9    those things together tell me that he's not

10   properly carrying it to a location where

11   he's welcome.  It's now a sensitive

12   location due to the domestic volatility.

13        Q.    So let's take this piece by

14   piece.  You know under New York law you can

15   have a safe in your vehicle and put your

16   firearm in that safe?

17        A.    Yes.

18        Q.    Do you know if Mr. Spronz had a

19   safe in his vehicle?

20        A.    I don't.

21        Q.    Are you familiar with the auto

22   safes?

23        A.    Yes.

24        Q.    Okay.  You know that with the

25   press of a finger they can pop open based

1                    K. WUSTENHOFF

2      on fingerprints?

3           A.    Yes.

4           Q.    Okay.  And, do you know if

5      Mr. Spronz had such a safe?

6           A.    I know he sent me a picture of

7      him with a sweatshirt, but he didn't send

8      me a picture of the safe.

9           Q.    Did you ask him if he had a

10     safe?

11          A.    Mr. Spronz was very detailed in

12     everything else there.  I don't know why he

13     never mentioned that, so no, I did not ask

14     him.

15          Q.    So Mr. Spronz in fact didn't go

16     onto the property when he's told firearms

17     weren't welcome, he returned to his vehicle

18     to comply with the owner of the property?

19          A.    No, because he went up onto the

20     driveway, because the owner had a dispute

21     with him in the driveway with regard to him

22     having the firearm.

23          Q.    Okay.  But that, once he's told

24     by the owner he doesn't want guns on the

25     property, you said he went back to his

1                    K. WUSTENHOFF

2    truck?

3         A.    Yes.

4         Q.    Correct?

5         A.    Yes.

6         Q.    Is there a big red sign with a

7    big slash that says no guns on his

8    property?

9         A.    Not to my knowledge.

10         Q.    So when Mr. Spronz is advised

11    that this gentleman who owned the property

12    doesn't want him there with a firearm, he

13    leaves and goes to his truck; correct?

14         A.    Yes.

15         Q.    Comes back without a firearm,

16    according to the witness?

17         A.    Yes.

18         Q.    Okay.  Now, you said that this

19    was, one of the witness said they went

20    there to assist her in moving furniture and

21    it was a contentious divorce situation?

22         A.    Yes.

23         Q.    So if somebody's getting

24    divorced, anybody with a pistol can't go to

25    that home just because they're involved in

```
 1                    K. WUSTENHOFF
 2    a divorce?
 3         A.    The way that the witnesses and
 4    Mr. Spronz describe it is that it is
 5    potentially a volatile domestic situation.
 6    So before he even get's onto Algier's
 7    property, he knows he's going to a domestic
 8    situation with a firearm.
 9         Q.    Did Mr. Spronz say he knew it
10    was going to be, could potentially be a
11    violent domestic situation?
12         A.    He says that he knows he's
13    going there to move Kim Algier out of that
14    house because her and her husband are in
15    the midst of a divorce.
16         Q.    So, he doesn't say that he
17    anticipates a violent domestic situation,
18    does he?
19         A.    Of course not.
20         Q.    Other than the photographs that
21    Mr. Spronz sent in to you, were there any
22    other photographs involved in this matter?
23         A.    There were no photographs
24    provided to me.
25         Q.    Other than the ones Mr. Spronz
```

1                    K. WUSTENHOFF

2    sent you; correct?

3         A.    Correct.

4         Q.    Did you, you only spoke with

5    Mr. Wayne Algier on the phone?

6         A.    Yes.

7         Q.    During that conversation, did

8    he identify to you the type of logo on the

9    sweatshirt?

10        A.    Yes.

11        Q.    Something about a shooting

12   club?

13        A.    I think the shirt said

14   sharpshooter.

15        Q.    Sharpshooter.  That would be

16   the same thing that was sent to you on the

17   photograph by Mr. Spronz as part of his

18   package; correct?

19        A.    Yes.

20        Q.    Now, do you know the name of

21   the relative that was with Mr. Algier on

22   the day of the incident on February 18,

23   2023?

24        A.    I would have to review the

25   file.  I don't recall his name right now.

K. WUSTENHOFF

1

2    Q.    Do you know the relationship
3    they had?

4    A.    It would be a guess, I just
5    know it was a relative.

6    Q.    This phone call with
7    Mr. Algier, Algeer, whatever his name was,
8    approximately what date was that?  Did you
9    have that?

10    A.    I believe that was in March of
11    2023.

12    Q.    Did you ever speak to him
13    again?

14    A.    No.

15    Q.    Did you speak to him after
16    internal affairs opened up an investigation
17    into Mr. Spronz's pistol license
18    suspension?

19    A.    I don't know.

20    Q.    You don't know what? You don't
21    know if you spoke with him again?

22    A.    That's not the question you
23    asked.

24    Q.    There came a point in time
25    internal affairs began investigating

                    K. WUSTENHOFF
1

2    Mr. Spronz's civil matter?

3          A.    Yes.

4          Q.    When were you advised they were

5    investigating it?

6          A.    A couple of months in.

7          Q.    What couple of months; April,

8    May, June?

9          A.    I don't know counsellor.  You'd

10   have to look at their documents.  I don't

11   know when they started investigating it.

12         Q.    When did you first learn about

13   it?

14         A.    Maybe two months in, maybe it

15   was in April. Could have been May.

16         Q.    My question is after your March

17   call with Mr. Algier, did you make another

18   call to him after internal affairs began

19   investigating this?

20         A.    I don't know because I don't

21   know exactly what date internal affairs

22   started. So if I spoke with Mr. Algier, I

23   wouldn't have knowledge as to when internal

24   affairs became involved.

25         Q.    Okay.  Would that also be in

                        K. WUSTENHOFF

1

2    your notes, any other phone calls to

3    Mr. Algeer, Algier?

4         A.    If I made a phone call that

5    would have probably been in there.

6         Q.    What do you mean would have

7    probably?

8         A.    If I made a phone call I would

9    have documented it, I would have documented

10   it.

11        Q.    Now, I want to turn to your

12   transfer to the pistol license section.

13   You had previously been in highway; is that

14   correct?

15        A.    No.

16        Q.    Where were you previously?

17        A.    Directly before here I was in

18   the court liaison section.

19        Q.    Before the court liaison

20   section where were you?

21        A.    The 4th precinct.

22        Q.    As what?

23        A.    Police officer.

24        Q.    When did you get assigned to

25   the 4th?

                        K. WUSTENHOFF

1

2       A.      In October of 2013.

3       Q.      You remained there up until

4    what date?

5       A.      Until August of 2020.

6       Q.      That was when you were assigned

7    to court liaison?

8       A.      No.

9       Q.      Okay.  Where were you assigned

10   in August of 2020?

11      A.      I requested a transfer and they

12   moved me to community relations bureau.

13      Q.      When was that?

14      A.      In August of 2020.

15      Q.      What date in August of 2020?

16      A.      I'd have to look at any

17   personnel jacket. I don't remember exact

18   what date.

19      Q.      On August 10, 2020 where were

20   you assigned?

21      A.      The 4th precinct.

22      Q.      What was your function?

23      A.      I was in the patrol command.

24      Q.      Were you still some kind of a

25   DWI expert?

K. WUSTENHOFF

1

2      A.    I like to think I'm still some
3   kind of a DWI expert.
4      Q.    But you told me previously you
5   were assigned to some DWI, I forget what
6   you called it, task force or something?
7      A.    The task force was two commands
8   before that.
9      Q.    Where did you go after the task
10  force?
11     A.    To selective alcohol fatality
12  enforcement team.
13     Q.    Where did you go after that?
14     A.    To the 4th precinct.
15     Q.    Why did you leave selective
16  enforcement to go to the 4th precinct?
17     A.    I needed more time with my
18  children, so I had to change where I was
19  working.
20     Q.    Okay.  So now getting back to
21  August 10, 2020 you were working in the 4th
22  precinct?
23     A.    Yes.
24     Q.    You responded to a motor
25  vehicle accident on that date involving an

```
 1                    K. WUSTENHOFF
 2    off duty officer Mascarella?
 3          A.    Yes.
 4          Q.    And, there was a Sergeant
 5    McQuaid running the scene?
 6          A.    Yes.
 7          Q.    At some point he directed you
 8    to go and take a field sobriety, portable
 9    breath test of Officer Mascarella?
10               MS. ZWILLING: Objection.  I
11          want to note standing objection to
12          any questions concerning the
13          officer's personnel or disciplinary
14          history, but you may proceed.
15          Q.    You were directed to issue, to
16    a BPP to Officer Mascarella?
17          A.    You'll have to forgive me
18    because I don't do these every day.  The
19    county attorney just said something so I'm
20    just trying to find out.
21          Q.    She said you can answer.
22               MS. ZWILLING: You can answer.
23          Q.    It's a continuing objection?
24               MS. ZWILLING: Yes.
25          A.    If I could ask you, Mr. Young,
```

1                   K. WUSTENHOFF

2     if you could repeat your question.

3          Q.    Sure.  Sergeant McQuaid told

4     you to give Officer Mascarella a portable

5     breath test; correct?

6          A.    Yes.

7          Q.    And you took his camera from

8     the scene of the accident and you went to

9     issue this test to Officer Mascarella;

10    correct?

11         A.    Yes.

12         Q.    And you went to Southside

13    Hospital where Officer Mascarella was;

14    correct?

15         A.    Yes.

16         Q.    And while there, you went in

17    the bathroom and took the portable breat

18    test and issued it to yourself; correct?

19    You took the test yourself?

20         A.    First you asked me and then you

21    told me, so which is it.

22         Q.    Did you take the breath test

23    yourself?

24         A.    Yes, I did.

25         Q.    Did you take photographs of the

```
 1                    K. WUSTENHOFF
 2    results of that breath test?
 3         A.    Yes.
 4         Q.    And you did it with Sergeant
 5    McQuaid's department camera; correct?
 6         A.    Yes.
 7         Q.    You had that camera in your
 8    possession until what time?
 9         A.    It was either the following day
10    or the day after that.
11         Q.    And then you returned it to
12    who?
13         A.    To Sergeant McQuaid.
14         Q.    And the picture of the results
15    of that breath test were no longer in that
16    camera; correct?
17         A.    That is what I'm told.
18         Q.    As a result of the incident
19    involving this off duty police officer in
20    this accident, you wound up with internal
21    affairs charges and specification; correct?
22         A.    Yes.
23         Q.    12 charges?
24         A.    I'd have to have it in front of
25    me but if nobody objects I'll say if you
```

                    K. WUSTENHOFF

 1

 2    say so.

 3         Q.    There was a pretty intensive

 4    investigation into this entire motor

 5    vehicle accident involving Officer

 6    Mascarella?

 7              MS. ZWILLING: Objection you

 8         may answer.

 9         A.    I suppose.

10         Q.    You were interviewed by

11    internal affairs and it was recorded on

12    audiotape; is that correct?

13         A.    I believe it was.

14         Q.    Ultimately you agreed to a

15    stipulation with internal affairs regarding

16    your conduct from that auto accident; is

17    that correct?

18         A.    Yes.

19         Q.    And, what was the sanction you

20    received regarding this incident?

21         A.    I don't have that in front of

22    me, so.

23         Q.    You were suspended for a period

24    of time?

25         A.    I was.

                    K. WUSTENHOFF

1

2       Q.      How long was that perfect?

3       A.      I believe it was 30 working

4    days.

5       Q.      When did you return to work

6    after your suspension?

7       A.      The suspension began in

8    February of '22 and I returned to work in

9    March of '22.

10      Q.      Okay.  At that time where were

11   you assigned?

12      A.      At that time I was assigned to

13   court liaison section.

14      Q.      How long did you remain there?

15      A.      Approximately seven months.

16      Q.      Where did you go from there?

17      A.      From there I came to pistol

18   licensing bureau.

19      Q.      Also as a part of this

20   involvement with internal affairs, you were

21   mandated to retire on the 20th day, the day

22   you have 20 years with the Suffolk County

23   Police Department?

24      A.      I would have to review that but

25   that sounds like one of the things that's

```
 1                    K. WUSTENHOFF
 2    in there.
 3         Q.    On average how many Suffolk
 4    County suspension cases are you
 5    investigating at a given time?
 6         A.    I would have to go out to my
 7    file box but I might have 20 or maybe up to
 8    30.  I want to say probably closer to 20.
 9         Q.    And each one lasts six months
10    approximately?
11         A.    No.
12         Q.    All right.  How long does each
13    one last?
14         A.    Standard of practice would be a
15    minimum of six months but if there are
16    other factors involved, it could go longer.
17         Q.    So is that if you have 20 cases
18    each month you get assigned or is that 20
19    cases in total that you carry?
20         A.    That's in total what I'm
21    carrying right now.
22         Q.    Now --
23              MR. YOUNG: Give me a moment.
24         Arlene, I'm going to need to take a
25         two or three minute break now if
```

1                    K. WUSTENHOFF

2          that's okay.

3                    MS. ZWILLING: That's fine.

4                    (Whereupon, a recess was

5          taken.)

6          Q.    Officer Wustenhoff, is he gone?

7     He's gone?

8                    MS. ZWILLING: You're having

9          difficulty with your video.

10                   THE WITNESS: We got the audio,

11         just not the video.

12         Q.    Returning to this, your notes

13    that you were taking as part of the matter,

14    they do not seem to contain dates when you

15    made phone calls, like your phone call to

16    Mr. Wayne Algier, or Algeer.  It doesn't

17    say a date that you called him.  Many of

18    these entries don't have dates or times

19    when these phone calls were made.  Is that

20    your ordinary course not to date, not to

21    memorialize a date and time speaking with

22    people?

23                   MS. ZWILLING: Objection, you

24         may answer.

25         A.    I believe everything that I

                    K. WUSTENHOFF

1

2   documented has a date on it.  Can you hear

3   me, can you hear me.

4        Q.    I can hear you.  And I'd

5   reading your reports and they simply say

6   spoke with Algier.  Doesn't have a date or

7   a time or the amount of call.  Doesn't have

8   anything and I'm asking you how many times

9   did you speak to Mr. Algier?

10       A.    There we go.  So you want to

11  know how many times I spoke with him.

12       Q.    Yeah, because your notes

13  reflect one conversation?

14       A.    I believe I did one, like an

15  interview follow-up based on some of the

16  case information I already had.

17       Q.    Okay.  What was the sum and

18  substance of that conversation?

19       A.    That was when he told me what

20  his perspective of the incident that took

21  place was.

22       Q.    What did he tell you?

23       A.    He told me about Mr. Spronz

24  coming to the house.

25       Q.    That's in your notes, that he

                    K. WUSTENHOFF

1

2    came to the house and there was a show of

3    force and all of that?

4         A.    Yes.

5         Q.    What date or approximate date

6    was that conversation had?

7         A.    I think that might have been a

8    little later, could have been May or even

9    June.  I would have to look at the file

10   itself but I think the data sheet would

11   record the date I had that conversation

12   with him.  It would say it right before I

13   documented the call.

14        Q.    I'm reading your thing and it

15   just says follow-up telephone interview

16   with Wayne Algier, his birthday, regarding

17   that he complained and it goes right onto

18   2/18/23.  There's no date or time when the

19   call was actually made.  Now it says,

20   follow-up telephone interview with Wayne

21   Algier.  Do you mean that's a follow-up to

22   the report or is that a follow-up to a

23   prior phone call?

24        A.    I believe that was a follow-up

25   for the report.

1              K. WUSTENHOFF

2       Q.    Okay.  Now, at any time,

3   although you don't detail it, did you ever

4   discuss the type of firearm with Mr. Algier

5   that he alleges Mr. Spronz had?

6       A.    That it was a handgun.

7       Q.    I understand it was a handgun.

8   That's why he has a pistol license. Did he

9   describe whether it was a revolver, an

10  automatic, a large gun, a small gun?

11      A.    Well both a revolver and a

12  semi-automatic would be a handgun.

13      Q.    I just said that. Okay so --

14            THE REPORTER: One at a time.

15      Q.    What type of handgun was?

16      A.    He doesn't specifically give me

17  a make, model, or serial number.

18      Q.    Does he give you whether it was

19  an automatic or a revolver?

20      A.    No, I don't believe he did.

21      Q.    To your knowledge, at any time

22  did Suffolk County seek to impose a red

23  flag law against Mr. Eric Spronz?

24      A.    To my knowledge, no.

25      Q.    Okay.  To your knowledge, in

K. WUSTENHOFF

1

2  this particular matter was the suspension

3  judicially mandated?

4        A.    No.

5        Q.    So no judge was involved in

6  this case before his suspension; to your

7  knowledge?

8        A.    Yes.

9        Q.    Yes, what? A judge was involved

10  or a judge wasn't involved?

11        A.    To my knowledge a judge was not

12  involved.

13        Q.    Now, where in the pistol

14  license handbook does it state that you

15  have to keep your weapon concealed at all

16  times; do you know?  You know where that

17  exists?

18        A.    I know in the book. If you're

19  asking me to cite the chapter, I don't know

20  that, no.

21        Q.    And, where in the book does it

22  say that any alleged violation results in

23  an automatic six month suspension?

24        A.    Again I would have to have that

25  book in front of me to know what chapter

K. WUSTENHOFF

2    that is.

3         Q.    But you're saying it's in that
4    book somewhere?

5         A.    Say that again.  Can you just
6    ask me the question again.

7         Q.    Okay.  The pistol license
8    handbook, does it state that any allegation
9    of carrying out a class results in a six
10   month suspension? Is that anywhere in that
11   book?

12        A.    No.

13        Q.    Where is it kept that this is
14   automatically a six month suspension?

15        A.    It is a standard of practice in
16   the bureau.

17        Q.    So it's not written down
18   anywhere; to your knowledge?

19        A.    To my knowledge, no.

20        Q.    Who determines that suspension
21   time?

22        A.    Ultimately it would be my
23   supervisor, chain of command, inspector,
24   chief, police commissioner.

25        Q.    So you obviously don't know

                         K. WUSTENHOFF

1
2    where that directive comes down from?

3         A.    The origin of it, no.

4         Q.    And the entire time you've been

5    in the pistol section that that's the rule?

6         A.    It's the standard of practice.

7         Q.    Okay.  Effectually it's the

8    policy of Suffolk County?

9              MS. ZWILLING: Objection, you

10        can answer.

11        A.    No.  It is the standard of

12   practice for the bureau.

13        Q.    So that's their policy?

14             MS. ZWILLING: Objection, he's

15        given you the answer.  You can't

16        re-ask the question.

17        Q.    Is that standard of practice

18   ever deviated from?

19        A.    It can be.

20        Q.    To your knowledge, has it been?

21        A.    That's not a position that I

22   can make that decision.  I'm not in that

23   position.

24        Q.    Have you ever seen a case where

25   someone wasn't suspended even though they

                    K. WUSTENHOFF

1
2    were alleged to have done something?
3         A.    Have I personally touched a
4    case like that.
5         Q.    Not touched it, know of,
6    knowledge?
7         A.    There's a variety of
8    circumstances so you'd have to be specific.
9         Q.    I'm asking you, to your
10   knowledge, to only your knowledge, do you
11   know of any case where somebody was alleged
12   to have violated the pistol handbook and
13   they weren't suspended?
14        A.    To my knowledge, no.
15        Q.    Okay, that's all.
16             MR. YOUNG: That's all the
17        questions I have for this witness.
18             THE REPORTER: Mr. Young, are
19        you ordering this transcript?
20             MR. YOUNG: Yes.
21             THE REPORTER: Ms. Zwilling,
22        are you ordering this transcript.
23             MS. ZWILLING: No.
24             THE REPORTER: Mr. Morris are
25        you ordering this transcript.

```
 1                    K. WUSTENHOFF

 2              MR. MORRIS: I'm with Mr.

 3         Young.

 4              MR. YOUNG: We're ordering it

 5         together, one copy.

 6              (11:39  a.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                K. WUSTENHOFF

 2          A C K N O W L E D G E M E N T

 3

 4    STATE OF NEW YORK)

 5                        :ss

 6    COUNTY OF QUEENS)

 7      I, KEVIN WUSTENHOFF, hereby certify that

 8    I have read the transcript of my testimony

 9    taken under oath on September 26, 2024,

10    that the transcript is a true, complete and

11    correct record of what was asked, answered

12    and said during my testimony under oath,

13    and that the answers on the record as given

14    by me are true and correct.

15

16

17    _____

18

19    Signed and subscribed to

20    before me, this _____ day

21    of _____, _____.

22

23    _____

24    Notary Public

25
```

1      K. WUSTENHOFF

2      I N D E X

3

WITNESS   EXAMINATION BY   PAGE

4

K. Wustenhoff  Mr. Young    5

5

6

    REQUESTS FOR PRODUCTION

7

DESCRIPTION       PAGE

8

File notes        23

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 K. WUSTENHOFF

2

3             C E R T I F I C A T E

        I, GABRIELLA TUTINO, a shorthand

4  reporter and Notary Public within and for
    the State of New York, do hereby certify:

5        That the witness(es) whose testimony
    is hereinbefore set forth was duly sworn

6  by me, and the foregoing transcript is a
    true record of the testimony given by

7  such witness(es).
        I further certify that I am not

8  related to any of the parties to this
    action by blood or marriage, and that I

9  am in no way interested in the outcome
    of this matter.

10

11

12

13           GABRIELLA TUTINO

14

15

16

17

18

19

20

21

22

23

24

25